***********
The Full Commission reviewed the prior Decision and Order based upon the record of the proceedings before Deputy Commissioner Glenn, the records contained in the Commission's file in this matter and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence, the Full Commission reverses the Deputy Commissioner's denial of benefits and enters the following Decision and Order.
 ***********
Based upon all the credible and competent evidence presented at hearing and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiffs filed three tort claims, seeking damages from the Department of Transportation for negligence. Part of their claim involved damage to their motor vehicles while the vehicles were held by the Department in a private storage facility; the other part of their claim involved alleged mental anguish for an alleged unlawful arrest.
2. Plaintiffs alleged that DMV Inspectors H.D. Smith, H.H. Gillam, and B.K. Bozard acted negligently when they relied solely upon allegedly false information given by James Pearce, a former neighbor of plaintiffs, asserting that plaintiffs might be in possession of stolen vehicles and might be operating a car dealership without a license. Based upon such information, the inspectors entered upon plaintiffs' land, seized certain vehicles and component parts, and procured the arrests of John and David Becker on misdemeanor and felony charges, in violation of the North Carolina Motor Vehicle Code.
3. Plaintiffs alleged that their damages consisted of, in addition to towing and storage fees, humiliation, embarrassment, mental distress, injury to reputations, family, work, and sense of well being, and that they were put into public scandal, infamy, and disgrace.
4. Inspector Gillam was employed as an Inspector for Defendant's License and Theft Bureau on the date in question. On the date of the hearing before the Deputy Commissioner, Defendant had employed Gillam for 21 years, with 10 years serving as a uniformed officer, and 11 years as an inspector. He had over 3,000 hours in training, with 40 annual hours in continuing education courses in auto theft and vehicle identification.
5. As a DMV Inspector, Gillam is a sworn peace officer with statewide arrest powers, and his duties included, inter alia, investigation of automobile theft, dealer violations, motor vehicle violations, and investigation of persons operating as dealers without a license. His district included several northeastern counties in North Carolina.
6. Motor vehicles are equipped with public vehicle identification numbers (PVINs) and confidential vehicle identification numbers (CVINs), and it is common in vehicle theft rings for PVINs to be altered. Inspectors are trained to locate the CVINs on vehicles and match them to the PVINs to see if they match, which assists them in determining whether a vehicle has been stolen.
7. PVINs and CVINs of the same vehicle should match. CVINs are affixed by manufacturers in hidden places on a vehicle to allow Inspectors and law enforcement to positively prove the identity of that vehicle. The CVIN is not common knowledge to the public, whereas the PVIN is openly visible and usually located on the door frame or dashboard.
8. In mid-October 1998, Inspector Gary White received a letter signed and written by James Pearce, a former neighbor of plaintiffs, stating that plaintiffs were operating a junk yard and selling vehicles without a license; were buying and selling cars, trucks, tractors, and boats without being licensed by the State; the individuals were driving vehicles with improper registration, no insurance; and that there were numerous vehicles at that location, some of which may possibly have been stolen out of the eastern Virginia area.
9. The letter also stated that there were vehicles being offered for sale in front of the trailer near Hwy 158, and that numerous vehicles were scattered about the property with numerous junked vehicles behind the two-story house.
10. The letter described the location of the vehicles as being alongside Hwy 158, containing a mobile home, a two-story white frame house, with numerous pecan trees located on the property, and plaintiffs John and David Becker did reside beside Hwy 158, in Gates County, North Carolina, in a mobile home and two-story frame house, with numerous pecan trees on the property.
11. Several days prior to October 27, 1998, Pearce's letter was either faxed to Gillam and fellow Inspector Smith, or its contents were communicated to them by White.
12. Gillam testified that none of the letters shown to him by plaintiffs' counsel during the hearing before the Deputy Commissioner was the letter he saw that prompted him to drive by Beckers' property on October 26, 1998. He further testified that the first time he saw Pearce's 1998 letters was during the hearing before the Deputy Commissioner.
13. Prior to receiving Pearce's letter, Gillam and other Inspectors had been investigating vehicle theft cases involving vehicles being stolen and transported between Virginia and North Carolina, along with stolen vehicles possibly being stored in Gates County, North Carolina.
14. Gillam treated Pearce's letter like he had treated other complaints received by the DMV, and discussed the contents with Inspectors Smith and Bozard, and decided to conduct a visual reconnaissance of the area to determine the validity of the statements.
15. On October 26, 1998, Gillam drove along Hwy 158 several times, and observed numerous vehicles scattered about plaintiffs' property, including several Cameros that did not have license plates affixed to them.
16. There were three motor vehicles displayed for sale next to Hwy 158, facing the highway, located either in the right-of-way or next to the right-of-way: a white truck, a BMW, and a Chevrolet.
17. Approximately 200 to 300 feet behind the white house was a neatly arranged line of vehicles, which included tractors, a dump truck, and numerous wrecked vehicles in various states of dismantlement, some with doors, hoods, and windows removed. All of the vehicles were clearly visible to Gillam from Hwy 158.
18. John Becker resided in the house, and David Becker resided in the trailer. Both properties were owned by Madeline Becker, their mother, who resided at a different location with John Yahn, her husband.
19. Gillam testified that the line of vehicles was not consistent with abandoned vehicles he had seen in the past, because the line was a neatly kept, well-manicured area with the grass mowed along side the vehicles, and it appeared to him that people had been making trips back and forth to the vehicles to get parts off of them.
20. Based on his visual inspection and 11 years of experience as a DMV License and Theft Inspector, Gillam was of the opinion that this collection of vehicles was consistent with someone possibly operating as a car dealer without a license. Gillam based this belief on his knowledge that dealers who try to avoid the "five car rule" are aware they need a license to sell more than five cars in a 12-month period, and will display between two to four vehicles to avoid drawing attention to themselves but will have other vehicles parked at different locations on the property trying to make it appear that those cars are not for sale.
21. Gillam was also of the opinion that someone on the property might have been operating some sort of vehicle repair or wrecking operation, because the vehicles behind the house were in various states of dismantlement, with hoods, doors and other vehicle parts missing.
22. Based on his visual inspection of the Becker property, Gillam was able to confirm many of the allegations contained in Pearce's letter, specifically that there were numerous cars on the property, some for sale, and that a junkyard or wrecking operation might be taking place.
23. Later that day, on October 26, 1998, Gillam notified other law enforcement officials of what he found, and that he intended to go onto the land to ascertain the identification numbers of the vehicles offered for sale and identify the persons offering the vehicles for sale for the purpose of determining if the vehicles were stolen and whether they were complying with DMV law.
24. Gillam testified that had he driven by the Becker property, without ever having any knowledge of the Pearce letter, and saw the vehicles displayed for sale by the road, the numerous vehicles sitting in various places around the yard with no license tags, and the neat, long line of vehicles in various stages of dismantlement 200 to 300 feet behind the house. Based on these observations alone, he would have initiated an investigation on his own accord, because such facts would be consistent with what one would find when a person is selling more than five cars in a 12 — month period without being licensed by the DMV.
25. Gillam testified that he had been involved in other cases where dealers operating without a dealer's license possessed vehicles that did not have license plates affixed to them.
26. Madeline, John, and David Becker admitted during the hearing before the Deputy Commissioner that between 15 to 20 cars in various conditions were present on the property, many of which were not road worthy.
27. On October 27, 1998, Inspectors Gillam, Smith, and Bozard, two law enforcement officers from Virginia, and Agent Fred Sadler of the National Insurance Crime Bureau, entered upon plaintiffs' property beside Hwy 158 to inspect the vehicles Gillam observed the day before. The conditions they saw on this day were substantially similar to those existing on the previous day.
28. Pearce's letter played no part in Gillam's decision to go onto the Becker property on October 27, 1998, though it did play a part in his driving by the property on October 26, 1998.
29. Gillam testified that it is regular DMV practice for Inspectors to go onto property without a search warrant where there appears to be a dealership, wrecking, or repair operation in existence, in order to determine motor vehicle identifications. Further, Gillam did not consider the inspection of the Becker vehicles a search, but rather an examination of the identification numbers of the motor vehicles.
30. John Becker testified that he expected strangers who might be interested in purchasing one of the vehicles offered for sale to come onto his property to inspect the vehicles, even though a private property sign was displayed by the driveway.
31. As Inspectors and law enforcement officers drove into plaintiffs' driveway, Gillam observed in plain view a white Camero, and a black pickup truck. Displayed in the pickup truck's window was an inspection sticker that was immediately recognizable to Gillam as a forged and altered inspection sticker.
32. The altered inspection sticker on the black truck was visible from the roadway, and the truck was backed into the yard in front of the house porch, about three car lengths from the road.
33. Gillam walked over to the truck and confirmed that the inspection sticker had in fact been altered with a black magic marker, and was taped to the truck's windshield.
34. Throughout the inspection, John Becker was present and escorted Gillam and other Inspectors around the property. He voluntarily talked to the Inspectors, showed them various vehicles on the property, indicated who owned which vehicle, and was generally cooperative.
35. Inspector Gillam testified without contradiction to the following, which are found as facts by the Full Commission, while referring to Defendant's Exhibit 1, a notebook of photographs taken by Inspectors on October 27, 1998:
1. Page 1 of the notebook shows the PVIN plate removed by DMV Inspectors from a blue Camero owned by Ernest Eugene Preas, Jr., of Moyock, North Carolina, and this PVIN did not match the CVIN on the blue Camero. The blue Camero was sold by Plaintiff David Becker to Preas sometime in or around June 1998. But this PVIN did match the CVIN of the white Camero found in the long line of salvaged or wrecked vehicles on Plaintiffs' property on October 27, 1998.
2. Page 2 shows the PVIN plate removed from Preas' blue Camero, but the number matched the CVIN located on the white Camero found on Plaintiffs' property.
3. Page 3 shows the PVIN plate removed from the white Camero located on Plaintiff's property, with a standard, non-manufacturer aluminum pop rivets that was used to attach it to the car, and this pop rivet was not the one the original manufacturer installed when the car was manufactured.
4. Pages 6 and 7 show the windshield of the white Camero with a windshield that appeared to be smashed with a hammer directly over the location of the PVIN plate, with the glass easily folded back, revealing non-manufacturer rosette aluminum pop rivets and a rusty PVIN plate; and on October 27, 1998, Inspectors compared that PVIN to the body identification plate on the car, and they did not match.
5. It was revealed, after checking the DMV database that day, that the PVIN found on the white Camero should have been attached to the blue Camero sold to Preas. Gillam discovered that Plaintiff David Becker had sold Preas that car around June 1998; it was Gillam's opinion that someone had switched the PVINs on the Cameros prior to the blue one being sold to Preas.
6. According to the DMV database, checked that day, Gillam discovered that none of Plaintiffs' names appeared in the chain of title to the blue Camero, which indicated to Gillam that David Becker sold the car to Preas with an open title, which is a violation of motor vehicle law.
7. Page 9 showed an out of date inspection sticker lying on the dash of another Camero located on Plaintiffs' property that was parked behind the black truck; Gillam considered this a violation of motor vehicle law because the sticker should have been affixed to the vehicle for which the inspection was given.
8. Pages 11, 12, 22, and 23 show another forged inspection sticker Inspectors removed from a black Camero parked in Plaintiffs' driveway, where someone had taken a black magic marker and changed the number "1" to an "11," from January 1998 date to November 1998.
9. Pages 13, 14 and 15 show (Defendant's Exhibit 2) the forged inspection sticker taken from the black Chevy truck, where someone had taken a black magic marker and altered the year, changing 1996 to 1998.
10. John Becker admitted to Inspectors Gillam, Bozard and Smith that day that he got these inspection stickers from another vehicle and forged them, and he was subsequently charged with violations for same.
11. Page 17 shows David Becker's residence, with vehicles scattered about the property with no license tags on the vehicles.
12. Page 18 shows the brown and white 1978 Chevy truck Inspectors seized because it had a missing or altered PVIN, and because David Becker claimed ownership to the truck, he was charged with possession of a vehicle with a missing or altered PVIN.
13. Page 19 shows an example of a truck in various stages of dismantlement, with the hood, front grill, and doors missing, and was located in the line of vehicles behind the house and was visible from the road; and next to the truck was a 1970s Duster car, which was missing its PVIN plate and was seized; and was also a violation of motor vehicle law.
14. Page 20 shows in the background the three vehicles offered for sale near Hwy 158.
15. Page 25 shows a picture of a U-haul engine lift located on Plaintiffs' property which is used to lift engines out of cars that can be rented from U-Haul Corporation.
16. Page 26 shows the PVIN plate that was located on the white 1979 Chevy truck offered for sale in David Becker's front yard, with the plate riveted to the inside door frame of the truck; however, upon closer inspection, it was revealed that this PVIN plate corresponded to, and should have been affixed to the 1978 brown and white Chevy truck parked behind David Becker's trailer; and David Becker was charged with a felony for switching the PVIN plates of the trucks.
17. Pages 27 and 28 are photos of the white 1979 truck taken by the previous owner, where the true PVIN plate on this truck should be a narrow elongated plate that is riveted to the left side of the dashboard; however, the incorrect PVIN plate found on the truck while in the possession of David Becker was affixed to the door frame using standard aluminum pop rivets.
18. After the Inspectors pulled back the dashboard material on the white Chevy truck, it was discovered that the PVIN plate that should have been affixed to this area was missing; and David Becker was charged with possession of a vehicle with a missing or altered PVIN plate.
19. Pages 30 and 31 show the location of where the true PVIN plate on the brown and white 1978 Chevy truck should have been located, on the door frame; however, this PVIN was improperly affixed to the door frame of the white 1979 Chevy truck.
20. Page 32 shows the window decal found inside the brown and white 1978 truck the inspectors used to match the PVIN plate improperly located on the door frame of the 1979 white truck.
21. Pages 34 and 35 show the windshield area of the 1970s Duster, on which Inspectors discovered the PVIN plate on the dashboard missing; John Becker was charged with possession of a vehicle with a missing or altered PVIN because the Duster was located on his side of the property.
22. Page 36 shows the 1977 Chevy van that was seized, along with the area of the door frame where the PVIN plate should have been affixed, but it was missing;
23. Pages 37 and 38 show a Virginia registration sticker affixed to one of the vehicles found on Plaintiffs' property.
36. Gillam told plaintiffs that John and David Becker were going to be arrested for, among other things, possession of motor vehicles that had missing or altered PVINS.
37. Inspector Smith allowed John Becker to take items out of the brown truck prior to the truck being seized.
38. John Becker was handcuffed after he was placed under arrest, and was then placed in a police vehicle.
39. As a result of the Inspectors' examination of the vehicles on October 27, 1998, the following vehicles were seized: the 1978 and 1979 Chevy trucks, the Duster, the van, and the Camero. This seizure created a bailment by implication, with the owners of the vehicles being the bailors and the Department
40. John Becker was charged with two counts of felony forgery of inspection stickers, one count of feloniously possessing a forged inspection certificate, and three counts of misdemeanor possession of vehicles with altered or missing PVINS.
41. David Becker was charged with one count of felony altering PVINS, and two counts of misdemeanor possession of vehicles with altered or missing PVINS.
42. At no time did the Inspectors accuse any of the plaintiffs of stealing cars or of dealing or using illegal drugs, and subsequent investigation did not reveal any stolen vehicles in plaintiffs' possession.
43. At a later date, after the inspectors discovered that the PVINs on Preas' blue Camero had been switched with David Becker's white Camero PVIN, and that the Camero was probably sold with an open title, additional charges were filed against David Becker for obtaining property by false pretenses.
44. The vehicles were taken to Grant's Texaco for holding because DMV did not have its own impound facility, and the county's impound facility was full.
45. DMV Inspectors were ordered by the local district attorney's office not to release any of plaintiffs' seized vehicles or component parts until they were instructed to do so by the court.
46. Because the law makes it illegal to possess a vehicle with a missing or altered PVIN, the DMV was prohibited from returning the seized vehicles until proper vehicle identification numbers had been applied for and assigned to the vehicles.
47. After a civil hearing in District Court in 2001, plaintiffs requested, and DMV agreed to assign, a Special Vehicle Identification Numbers to the seized vehicles, as illustrated in Defendant's Exhibit 5. These numbers replaced the PVINs that were missing, which permitted DMV to return the vehicles to plaintiffs.
48. Madeline, John, and David Becker admitted that, prior to the civil hearing, neither they nor their lawyer requested that the DMV assign special vehicle identification numbers to the seized vehicles.
49. Because all criminal proceedings had ended and Special Identification Numbers were assigned, the vehicles were returned to plaintiffs sometime in 2001.
50. It was not unusual for seized vehicles to be held for a number of years where proper ownership of such vehicles was still in question, as was the case with the Becker vehicles.
51. Plaintiffs allowed Grant's Texaco to keep the white Camero, which was a junked car, in return for Grant's waiving its $600.00 storage fee.
52. A carburetor was stolen from one of the Becker vehicles while it was in storage at Grant's Texaco, but it is not known who stole it, how such persons gained access to the vehicle, or what acts or omissions, if any, on the part of Grant's contributed to the theft.
53. Notification letters from the Raleigh DMV office were not sent to plaintiffs within 15 days after the seizure, pursuant to N.C. Gen. Stat. § 20-108; however, Gillam did tell John and Madeline Becker on October 27, 1998, that the vehicles were being seized because they had missing or altered PVINS, that they would be stored at Grant's gas station to be held as evidence, and would be returned once the criminal case had been concluded. Thus, plaintiffs knew why the vehicles were seized and to where the vehicles were taken.
54. It was the responsibility of DMV officials in Raleigh to issue §20-108 notification letters to Plaintiffs, and not the responsibility of Inspectors Gillam, Smith, or Bozard.
55. Neither Gillam, Smith, nor Bozard conducted searches of plaintiffs' personal property on the day in question, but they did enter upon the land where John and David Becker resided for purposes of examining and inspecting the identification numbers of motor vehicles and motor vehicle component parts on that property.
56. Gillam had seen for the first time at the hearing before the Deputy Commissioner the two letters written by Pearce in 1998, and had never seen them prior to the hearing; however, he had read the 1999 letter prior to the hearing before the Deputy Commissioner
57. David Becker's criminal case was tried by the local district attorney before a jury, which found him to be not guilty.
58. Charges filed against John Becker were subsequently dropped by the district attorney's office.
59. Gillam, Smith, and Bozard did not charge Madeline Becker or John Yahn with any violations of the law.
60. Ed Webb, Sheriff of Gates County for the six years prior to the hearing before the Deputy Commissioner, testified that he lived in Gates County for the past 25 to 26 years, had been a police officer for the previous 20 years in the Rowan, Chowan, and Gates County areas, and that he interacted with people in the community on a regular basis at grocery stores and other places.
62. Without contradiction, Sheriff Webb testified that he was familiar with the reputations of John and David Becker prior to October 27, 1998, and that they were known as "hell raisers" and "pot heads." Sheriff Webb based his testimony on information received from former sheriffs, information on file at the sheriff's office, and information received from citizens in the community.
63. Sheriff Webb testified that he was familiar with John and David Becker's reputations after October 27, 1998, and that their reputations had not changed. He testified that one brother had eight contacts with the Sheriff's office, and the other had six contacts, which may have included complaints, citations, civil papers served on the Beckers, or an arrest. Sheriff Webb stated that David Becker had more contacts with the Sheriff's office than his brother John, and that the Sheriff had been involved in an investigation involving John in Chowan County that involved marijuana.
64. Sheriff Webb testified that the Becker brothers' reputation as "pot heads" involved pot smoking, using, and growing marijuana. He testified that they had that reputation since high school, and that such reputation continues.
65. Sheriff Webb was of the opinion that the reputation of the Beckers in the community had not changed as a result of this incident.
66. On or about January 24, 2000, Madeline Becker was in receipt of a letter from Joe Gardener of the DMV Theft Bureau in Raleigh, which informed Ms. Becker that the seized vehicles could not be returned until the pending court case was disposed of, and that Madeline Becker needed to provide titles to each of the vehicles to allow DMV to issue special identification numbers to each vehicle that was missing PVINs.
67. Ms. Becker admitted that neither she nor her sons contacted the DMV to determine the proper procedure on how to secure the return of their vehicles, but their attorney may have done so.
68. Plaintiff presented no competent medical evidence from medical or mental health providers showing that their alleged mental and emotional distress was of a severe nature or was caused by any wrongdoing of defendant's employees.
69. There has been no finding that the officers did not have probable cause for the arrests they made.
70. Plaintiffs did not present any independent appraisals or estimates corroborating their claims of damages as they relate to alleged damage done to the vehicles or component parts while they were in storage. However, the evidence of record shows that plaintiffs had over twenty years of experience in repairing automobiles. Plaintiffs collectively testified that repairing vehicles was a family hobby in which they all participated, and that the Becker brothers each became involved in repairing cars with their parents at an early age. The family regularly attended auto shows together. In addition to automobile work, plaintiffs learned to repair a variety of engines, including dirt bikes, motorcycles, lawnmowers, and outboard engines. Thus, the Full Commission finds that plaintiffs' collective experience in automobile and engine repair enables them to credibly assess the value of automobile parts that were either lost or damaged while in storage.
71. The Full Commission finds that the following damages testified to by plaintiffs, and not rebutted by defendant with any evidence, are allowable within the context of this case:
 David Becker Damages:
 2 — 440 cylinder heads $1,000
 1 — aluminum 4 barrel intake manifold with valve covers $100
 1 — Holly and 850 carburetor $75
 1 — 4-speed transmission with bell housing, pistons and rods $500
 2 — hydraulic jacks $100
 1 — new carburetor (stolen off 79 Chevy truck) $250
 1 — 440 block, oil pan $500
 1 — junk Camaro (left at Grants as payment for stories charges) $500
 costs for loss of use of 79 Chevy truck and depreciation
 of value for almost three years $3000
 TOTAL DAVID BECKER DAMAGES $6,025
 NOTE: Ongoing emotional distress claimed by David Becker
 in the amount of $50,000 is not proper damages and is not
 recoverable within the context of this case.
 John Becker Damages:
 1 — rear axle-3:42 posi-traction (89 Trans Am) $500
 1 — rear axle-3:73 posi-traction 12 bolt (68 Camaro) $500
 1 — trans-(4-wheel-drive with 205 transfer case) $600
 numerous intake manifolds $250
 used carburetors and gauges $200
 TOTAL JOHN BECKER DAMAGES $2,050
 NOTE: Alleged loss of wages claimed by John Becker in
 the amount of $89,499 is not proper damages and is not
 recoverable within the context of this case. Likewise,
 continuing emotional distress claimed by John Becker in
 the amount of $50,000 is not proper damages and is not
 recoverable within the context of this case.
 John Yahn Damages:
 small claims court $90
 certified mail costs, gas costs for trips to court,
 doctors, lawyers and 2 consultation fees for
 2 other lawyers $1500
 Attorney Randall Wagner $10,575
 civil court transcript $672.50
 2 cylinder heads #461 castings $500
 1 350 Chevy transmission $150
 TOTAL JOHN YAHN DAMAGES $13,397.50
 NOTE: Criminal court transcript in the amount of $780
 and civil court transcript in the amount of $672.50 claimed
 by John Yahn are not proper damages and are not recoverable
 within the context of this case. Likewise, ongoing emotional
 distress claimed by John Yahn in the amount of $50,000 is not
 proper damages and is not recoverable within the context of
 this case.
 Madeline Becker Damages:
 1 — 5 speed Camaro transmission 1991 $500
 1 — used carburetor on 78 Chevy truck $75
 costs for loss of use of 78 Chevy truck and
 depreciation of value for almost three years $3000
 TOTAL MADELINE BECKER DAMAGES $3,575
 NOTE: Doctors costs and prescription medicine costs for
 depression claimed by Madeline Becker in the amount of
 $500 are not proper damages and not recoverable within
 the context of this case. Continuing emotional distress
 claimed by Madeline Becker in the amount of $50,000
 likewise are not proper damages and not recoverable
 within the context of this case.
 ***********
NOW THEREFORE, based upon the foregoing Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. It is plaintiffs' burden to prove that all the elements of negligence, including that defendant breached an owed duty of care, and that the breach was the proximate cause of plaintiff's injury. The evidence must be sufficient to raise more than speculation, guess, or mere possibility.
2. Plaintiffs failed to show by the greater weight of the evidence that defendant's employees breached a duty of care owed to plaintiffs by defendant with respect to the arrests and criminal prosecutions. Plaintiffs are entitled to no damages for loss of wages, claimed emotional distress, costs of bail, or costs of criminal trial transcripts or costs of civil trial transcripts. In addition, defendant proved that plaintiffs' reputations were not harmed by the actions of the enforcement officers in the carrying out of their lawful duties.
3. It is well-settled that once a bailment contract is created between a bailor and bailee, either expressly or by implication, the bailee is charged with a duty of care to protect the bailed property from damage or loss. When a bailee fails to return or deliver the bailed property in an undamaged condition, the bailor may bring an action to recover damages for breach of bailment contract and/or negligence based on proof that the bailee failed to exercise due care to safeguard the bailed property from damage, loss, or theft. See 46 Am.Jur. Proof of Facts 3d 361.
4. Plaintiffs proved that employees of defendant seized their vehicles, creating a bailment by implication. Plaintiffs also proved that defendant failed to return or deliver the bailed property in an undamaged condition and that department failed to exercise due care to safeguard the bailed property from damage, loss, or theft.
5. Under the circumstances of this case, the damages set forth in paragraph 73 of the findings of fact are proper damages with respect to the negligence of defendant in failing to care for and return the bailed property.
 ***********
Based upon the foregoing Findings of Facts and Conclusions of Law, the Full Commission enters the following
 ORDER
1. Judgment is entered against defendant and in favor of plaintiff David Becker in the amount of $6,025.00. Defendant shall satisfy this judgment forthwith by payment to David Becker in care of his attorney of record.
2. Judgment is entered against defendant and in favor of plaintiff John Becker in the amount of $2,050.00. Defendant shall satisfy this judgment forthwith by payment to John Becker in care of his attorney of record.
3. Judgment is entered against defendant and in favor of plaintiff John Yahn in the amount of $13,397.50. Defendant shall satisfy this judgment forthwith by payment to John Yahn in care of his attorney of record.
4. Judgment is entered against defendant and in favor of plaintiff Madeline Becker in the amount of $3,575.00. Defendant shall satisfy this judgment forthwith by payment to Madeline Becker in care of her attorney of record.
5. No costs are assessed.
This 23rd day of July 2004.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER